# United States District Court
## Northen District of Ohio
## Akron Division

| | | |
|---|---|---|
| **Joseph Streater on behalf of himself** | :: | |
| **and on behalf all others similarly** | | |
| **situated,** | :: | **Case No.**  5:18cv643 |
| **Plaintiffs,** | | |
| | :: | |
| **vs.** | | |
| | :: | |
| **Sarchione Chevrolet, Inc.** | | |
| **c/o Dennis R. Clunk, statutory agent** | :: | |
| **2040 South Union Ave.** | | |
| **Alliance, OH 44601** | :: | |
| **Defendant.** | | |
| _____/ | :: | |

---

## Complaint to Enforce Civil Liability Pursuant to the Federal Truth-in-Lending Act (TILA) and Ohio Consumer Sales Practices Act (OCSPA), Seeking Class Action Treatment, Actual, Statutory & Other Damages; Permanent Injunctive & Declaratory Relief; Attorney Fees & Jury Demand

---

Plaintiff, **Joseph Streater**, on behalf of himself and on behalf of all others similarly situated (hereinafter "named plaintiff"), sue defendant, **Sarchione Chevrolet, Inc.** (hereinafter "Defendant" or "Sarchione") and allege as follows:

### Introduction & Preamble

1. This is an action for statutory, actual, and other damages and for declaratory and injunctive relief brought pursuant to the federal Truth in Lending Act, 15 U.S.C. §§1601, et seq., Regulation Z, 12 C.F.R. §226.1, et seq. (hereinafter "TILA"), and the

Ohio Consumer Sales Practices Act (hereinafter "OCSPA"), ORC. 1345.01, et seq.

2.      At all times relevant and material Defendant was licensed to transact business in Ohio, believed to be in Portage County, and a creditor as it is defined in 15 U.S.C. §1602(f), 12 C.F.R. §226.2(17), and a supplier at it is defined in O.R.C §1345.01© and further engaged in consumer transactions as defined in O.R.C.§1345.01(A).

3.      Claim One alleges that Defendant, as a creditor, at all times refused to comply with TILA by providing Plaintiff and the putative class he seeks to represent, with retail installment sales contracts (RISCs) containing contradictory,  irreconcilable, illusory, and meaningless credit disclosures; obtained signatures on these RISCs, then delivered or promised to deliver the purchased vehicle to Plaintiff and the putative class members with no intention to honor any contract term or provision.  Instead, Defendant purports to tell all finance buyers that it is not a creditor and that there is no creditor unless and until it chooses to sell the RISC to a willing third party.  Defendant then surreptitiously obtains the buyer's signature on a separate waiver form which Defendant euphemistically calls a "Spot Delivery" agreement pointing only to the signature line (stating "sign here") intentionally not disclosing its purported significance.  The form contained language purporting to relieve Defendant from its legal status of "creditor," referring instead to some undisclosed third party, as a creditor, and then only if Defendant chooses to assign its contract.  According to Defendant, it is at the time of assignment that contract consummation occurs, if at all, in violation of  15 U.S.C. §1601(a), §1602(f), (g), §1638(b), 12 C.F.R. §226.1(b), §226.2(13), (17), §226.17(b), §226.18.

4.      Claim Two seeks actual damages and declaratory and injunctive relief as provided by the Ohio Consumer Sales Practices Act, O.R.C. §1345.01, et seq.  Plaintiff and the putative class seek a declaration that Defendant's acts and practices are violations of ORC §§1345.02 and 1345.03 as they are deceptive, unfair and/or unconscionable and are continuing and should be permanently enjoined.  The actual damages resulting from Defendant's violations include, but are not limited to, a $1000 downpayment paid by Plaintiff which Defendant refused to refund, expenses related to the purchase of insurance for that period of time when Defendant considered the purchased vehicle its property and not that of the Plaintiff, any increased cost of financing, and loss of use of the purchased vehicles, and loss of use of converted trade-ins.

5.      The size of each class is limited only by the applicable statutes of limitations, i.e., one year for TILA, 15 U.S.C. §1640(e) and two years for OCSPA.  Upon information and belief in the absence of discovery, the class under each count is estimated to exceed, at least, 250 members.  Plaintiffs allege that the class period under the OCSPA claim begins on or about March 19, 2016 and the TILA class begins on March 19, 2017.  Each class period closes as of the date of class certification.

**Claim One**
**[Truth-in-lending Act-tila]**
**Jurisdiction**

6.     The jurisdiction of this Court is invoked pursuant to 15 U.S.C. § 1640(e) and 28 U.S.C.§ 1337.  Venue is proper because the acts complained of occurred primarily in this District.

**Specific Factual Allegations**

7. Prior to October, 2107 Plaintiff began searching the internet for a Chevrolet Camaro ZL1 which had to be a 2014 or newer model. Each time he came close to finding one, by the time he inquired, the vehicle was sold. He finally found one advertised by Defendant, Sarchione.

8. On October 5, 2017 Plaintiff was put in touch with Defendant's salesman, Todd Bollman. Plaintiff gave Bollman his credit information and, as a result, he was told that deal could be "done" through "Santander" but it would require that his wife, Sonja Gumbrecht, co-sign.

9. During the week that followed, at the request of Bollman, Plaintiff sent numerous documents to Defendant evidencing proof of his employment and income so, as referenced by Defendant, to be able to sell the deal to Santander or some other third party lender source.

10. During this period Bollman made representations to the Plaintiff that he was so certain that the deal would be approved by Santander that he convinced the Plaintiff, on October 12, 2017, to dispatch his son from Camden, N.J. to the Defendant's location with his trade of a 2014 Honda Accord [hereinafter the "Accord" or "trade" and to inspect the subject vehicle he wanted to purchase from the Defendant.

- 4 -

11. While his son was present at the Defendant, Plaintiff negotiated the price of the Accord trade where Defendant agreed to payoff the balance Plaintiff owed to South Jersey Federal Credit Union, the lienholder, in the amount of $13,250. Plaintiff's son also paid $1000.00 on behalf of his father demanded by Defendant to supposedly hold the vehicle. He left the Accord trade with the Defendant and drove back to New Jersey with his cousin who came-up with him in a separate vehicle.

12. On October 23, 2017, after a seemingly long delay, Bollman texted Plaintiff that he got Santander to approve the deal with a $12000 downpayment which Plaintiff agreed to make. Bollman informed Plaintiff that he would be contacted shortly by its document agent to execute a retail installment sales contract [hereinafter the "Risc"] and other documents.

13.  On October 28, 2017 Plaintiff met in person with Defendant's agent in New Jersey to sign paperwork consisting primarily of the Risc and a Spot Delivery Agreement as well as some other documents. It expressly provided that the Defendant herein was the "seller-creditor" who was extending credit to the Plaintiff in the amount of  $51,791.04 which consisted of 72 consecutive monthly payments of $719.32 commencing November 17, 2017 [see attached Plaintiff's exhibit "A"]. At the same time Plaintiff was also required to sign a "Spot Delivery" agreement which directly contradicted the terms of the retail installment sales contract and which provided that the Defendant could void or change the terms of the Risc if it was unable to sell the deal to a third party [see attached Plaintiff's exhibit "B"]. At that time Plaintiff also added the subject Camaro vehicle to his insurance coverage.

14. Plaintiff asked for a copy of these documents which he signed from the agent at the time of the signing but the agent refused stating that they would have to come from the Defendant. On October 30, 2017, 2 days later, Plaintiff telephoned the agent and demanded copies of the documents he signed. The agent thereafter emailed a series of

documents to the Plaintiff. However, the Risc that was provided was just a partial copy not containing the top, bottom or rear portions of the document. Prior to the filing of the instant complaint, Plaintiff requested a copy of his Risc from the Defendant who refused to provide it, instead, referring Plaintiff to his lawyer, a Matthew Mohr, of the Clunk Law Firm who continues to refuse the request.

15. On November 2, 2017, Plaintiff received a text from Bollman asking Plaintiff to call. When he called he was informed that Defendant could not do the deal because Santander was re-structuring it in which it supposedly demanded that the Defendant pay an additional $1500 to it which "couldn't be passed on the customer". Plaintiff offered to pay the $1500 but Defendant refused and informed the Plaintiff that the deal was dead, that it would refund his $1000 downpayment and for Plaintiff to come and pick up his Accord trade. Defendant has, to date, refused to refund Plaintiff's $1000 downpayment after having agreed and promising to do so.

16. Thereafter, while Plaintiff was figuring out how to get his Accord back to New Jersey, Defendant maliciously, upon information and belief, contacted the lienholder and misrepresented to it that Plaintiff had abandoned his Accord trade in spite of the fact that Plaintiff continued making payments on it into January. Upon further information and belief, this information caused the lienholder to have the Accord sent to auction for sale in Ohio. Plaintiff is currently unaware of what has taken place with respect to the Accord because the lienholder has failed to send him any notice and, to date, refuses to provide him with any information concerning the whereabouts of the Accord trade.

- 6 -

## Legal Allegations

17. This is an action for actual and statutory damages plus costs and attorneys' fees, brought pursuant to 15 U.S.C. §1601(a), et seq., 15 U.S.C. §1638, Regulation Z, 12 C.F.R. §226.1, et seq., and 15 U.S.C. §1640(a).

18.  At all times material hereto Plaintiff and the putative class members were consumers, Defendant was a creditor, the credit extended was for consumer credit, and the transactions were credit sales, each as defined in 15 U.S.C. §1602 and 12 C.F.R. §226.2.

19.  During the class period consistent with the TILA limitations period, Defendant has invariably violated TILA and Regulation Z in each of its credit sales by using illusory TILA disclosures in its RISCs including the APR, the Finance Charge, the Amount Financed, the Total of Payments, the Total Sale Price and every other material credit term in the Plaintiff's and the putative classes' RISCs because, at the time of consummation as defined by TILA, the disclosures were subject to subsequent change or cancellation at Defendant's sole and arbitrary discretion; Plaintiffs' transaction being typical of the class.

20. Defendant's acts and omissions are violations of TILA as TILA's purpose is to assure a meaningful disclosures of all material terms so that consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit. This is the case because it is impossible to meaningfully compare terms that are cancellable or changeable at Defendant's whim with credit terms proposed by its competitors.

21. In practice Defendant purports to condition the Plaintiff's and the putative classes' RISCs on its desire and ability to sell its contractual obligation to a third party, thus illegally extending consummation to a point in time when a third party might buy

- 7 -

Defendant's RISC, days after buyer signing. TILA mandates that consummation occurs at the time that buyers sign a RISC.  12 C.F.R. §226.2(13).

22. Plaintiff alleges that his financing contract was not completed as to all essential provisions because at the time named Plaintiff and the putative class members signed a RISC, Defendant considered the Truth in Lending terms to be non-final and subject to change at Defendant's whim.  Defendant in practice either unilaterally changes the terms and then obtains the Plaintiff's and the putative classes' signatures on a second, unbargained-for contract, or Defendant considers itself not bound by the RISC terms, revokes the contract, fails to deliver the vehicle, seizes it or otherwise reacquires the purchased vehicles from the buyers. Hence the essential terms are not completed at the time of consummation, are fictitious and illusory, and are "completed", if ever, long after contract signing, depending upon whether Defendant chooses to sell (assign) the buyer-signed RISCs to a third party, or chooses to revoke the RISCs and unilaterally change the terms to its advantage. This, on the false excuse that "the bank rejected your credit."

23. After Defendant had Plaintiff complete a RISC, at the same time, it purported to relieve itself from its status as creditor and to waive the consumer protection of TILA by requiring him or her to execute a "Spot Delivery" Agreement.   Such waiver forms and waiver provisions are illegal as being contrary to the public policy enacted by TILA whose very purpose is to provide a ***meaningful*** disclosure of credit terms to consumers, including Plaintiffs and the putative class members. According to Defendant's unilateral revocation language, Defendant disclaims that it is a creditor despite the parties' previously executed RISC which expressly identifies and represents Defendant as the creditor.  According to its spot delivery document Defendant asserts that it is not a creditor and that it is magically discharged from TILA compliance because TILA applies only to creditors.

24. Plaintiff's and Defendant's RISC and Defendant's spot delivery form completely contradict one another. Plaintiff contends herein that Defendant's "spot delivery" form and language constitutes an illegal waiver of statutory obligations and consumer rights because Defendant uses them to circumvent its obligations under TILA and the RISC itself which, concomitantly waives the buyers' statutory and contractual rights. The statutes and the RISC provide that the buyer-signed contract be the parties' final integrated writing and be binding on Defendant and the consumer at the time of signing and vehicle delivery, i.e., consummation. The RISC and these consumer protection statutes are to be construed liberally in favor of consumers and strictly against the seller.

25. This combination of, on the one hand, the extension of credit in unambiguous terms, while on the other hand simultaneously withdrawing the extension of credit in the same document violates TILA, common law contract principles, i.e., merger doctrine, mutuality of obligation, consideration; violates equitable principles, and violates the OCSPA, as alleged *infra*.

## Claim Two
### [Ohio Consumer Sales Practices Act-OCSPA]

### Jurisdiction

26. This claim made is made pursuant to O.R.C. §1345.01, et seq. Venue is proper because the acts complained of occurred in this District and all parties are located in this District.

27. The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1367, in that Plaintiff's state claim is so related to their federal statutory claims the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28. Plaintiffs adopt and reallege all factual allegations and incorporate them herein by reference.

29. This is an action for actual damages and for declaratory and injunctive relief brought pursuant to the Ohio Consumer Sales Practices Act, §§1345.01, et seq., Ohio Revised Code.

30. Named Plaintiff and the putative classmembers are aggrieved parties and seek actual damages and a declaration that Defendant's acts and practices violate the OCSPA, and seek a permanent injunction prohibiting Defendant from engaging in the same or similar conduct in the future.

31. Without limiting the scope or the number of violations committed by Defendant, the following is a non-exclusive list of conduct which may be considered either deceptive, unfair, and/or unconscionable sales practices committed by Defendant:

    a.    obtaining customer signatures on contracts that are not fully completed at the time the customer signs.  (Defendant's financial procedure purports to render the RISC incomplete and subject to unilateral change.)

    b.    failing to deliver to Plaintiff and to the putative class members a copy of a RISC completed as to all essential provisions at or before consummation. (Contracts subject to Defendant's unilateral revocation pending assignment are not "completed" at time of buyer's signing because, according to Defendant, the RISCs are completed only upon assignment to a third party.)

    c.    obtaining, as part of its business practice, its customers' signatures on waiver forms or waiver provisions which purport to relieve it from its status as creditor, and which purport to waive and to circumvent the requirements of TILA, and the RISCs themselves.

    d.    knowingly causing the plaintiff to enter into a consumer transaction on terms Defendant knew were substantially one-sided in its favor.

    e.    knowingly failing to provide material credit disclosures required under federal law, including invariable credit terms.

f.    delaying the time of consummation from the date buyers sign a RISC to a later date when a third party buys the RISC from Defendant or, if a third party does not accept assignment, it claims that no consummation ever occurs.  12 C.F.R. §226.2(13).  (In practice Defendant purports to condition plaintiff's and the relevant classes' RISCs on Defendant's desire or ability to sell its contractual obligation to a third party).

 g.    keeping all or a portion of its financing customers' downpayments (including trade-ins) after revoking the RISCs and repossessing the sold vehicles.

 h.    requiring prospective customers to acquire and to pay for casualty insurance on the subject motor vehicles prior to entering into a binding contract for the purchase of a motor vehicle.  (Through the use of waiver forms and provisions, Defendant  claims that it remains the owner of the sold vehicles until such time, if at all, as assignment of the RISCs to a third party is effected.  If the motor vehicles are not owned by plaintiff or the putative class members, then any money paid toward insuring the motor vehicles constitutes damages to plaintiff and to the class members.)

I.    declaring that Defendant itself is not a creditor extending financing under the RISC and that the creditor is some as-yet unknown third party, and then only if Defendant  chooses to assign the RISC to a third party.

j.    contemporaneously extending credit to customers by way of  unambiguous RISC provisions including a merger clause, and revoking that extension of credit by use of one or more waiver forms or provisions.

 k.    failing to timely apply for transfer of title as prescribed in the ORC, in those RISC transactions that were recalled by Defendant.

l.    failing to provide adverse action notices to its financing customers.  (In all such transactions it is the defendant who revokes and rejects credit but issues no adverse action notices.)

m.    reserving the purported right to unilaterally revoke consumer RISCs, Defendant can and does insert financing terms in RISCs that are intentionally false just to obtain the buyers' signature.  Defendant does this to take the buyer out of the market so the buyer will shop no further in the belief that he or she has a completed deal.  Defendant's real intention, however, is to call the buyer back to the Defendant to change the terms to its advantage on the false representation that "the bank rejected your credit."  Defendant then cancels the contract, demands more money down, raises the interest rate, requires a cosigner, or even changes the year, make and model of the purchased vehicle.  The buyer has no practical means

of verifying Defendant's representations and must take Defendant's word regarding finance rejection as an article of faith.

n.    misrepresenting that the subject of a consumer transaction had sponsorship, approval, performance, characteristics, accessories, uses, or benefits that it did not have.

o.    misrepresenting that it had sponsorship, approval or affiliation that it did not have.

p.    falsely misrepresenting the rights, obligations and remedies that the plaintiff, as a consumer, had under law.

q.    knowingly making misstatements of opinion in connection with the transaction which was designed to exaggerate the remedies or power of Defendant.

## Class Action Allegations

32. Named Plaintiff brings this action on behalf of himself and all other individuals similarly situated as defined below.  This action is maintainable as a class action pursuant to the federal Rules of Civil Procedure, rules 23(b)(1), (b)(2) and (b)(3).

33. The classes named Plaintiff seeks to have certified are defined as follows

### Tila General Class
#### I. Tila General Class Claim

34. This class is defined as follows: All persons who have signed a retail installment sale contracts with Defendant similar or identical to the one signed by the Plaintiff within the class period defined by the applicable statute of limitations whose signatures were also obtained by Defendant on a Spot Delivery or similar type form purporting to give Defendant the unilateral right to cancel their contracts, which forms and language also purport to relieve Defendant from its status as creditor.

### Tila Sub-classes
#### A. Tila Claim One Subclass I

35. All persons who have signed a retail installment sales contract with Defendant within the class period defined by the applicable statute of limitations and whose signatures were also obtained by Defendant on a form purporting to give Defendant the unilateral right to cancel their contracts, and whose initial retail installment contracts were cancelled by Defendant.

## B. Tila Claim One Subclass II

36. All persons who have signed a retail installment sales contract with Defendant within the class period defined by the applicable statute of limitations and whose signatures were also obtained by Defendant on a form purporting to give Defendant the unilateral right to cancel their contracts, and whose initial retail installment sales contracts were cancelled by Defendant and who signed a second RISC with more expensive terms.

## C. Tila Claim One Subclass III

37.  All persons who have signed a retail installment sales contract with Defendant within the class period defined by the applicable statute of limitations and whose signatures were also obtained by Defendant on a form purporting to give Defendant the unilateral right to cancel their contracts, and whose initial retail installment sales contracts were cancelled by Defendant and whose downpayment was kept in whole or in  part by Defendant.

## III. Ocspa Claim Two General Class

38. This class is defined as: All persons who have entered into consumer transactions with Defendant within the class period defined by the applicable statute of limitations who were subjected to deceptive, unconscionable and unfair sales practices as defined in either the Ohio Consumer Sales Practices Act, or declared deceptive in Ohio Court decisions contained published in the Ohio Attorney General's Public Inspection File and/or which were in violation of the Ohio Administrative Code 109-4-3-16, et seq.

39.The members of each class and subclass so designated are so numerous that joinder of all the members is impracticable. While the exact number of class members can be determined only by appropriate discovery from the defendant, based upon knowledge and information Plaintiffs believe that each include well sufficient members as Defendant's financing procedure is virtually identical in every consumer financing transaction.

40. Named Plaintiff's claims are typical of the claims of the members of each class and subclass.  Plaintiff can fairly and adequately protect and represent the interests of the members of each class and subclass and have retained counsel competent and experienced in class action litigation. Plaintiff's claims are practically identical to claims of the members of each class and subclass because Defendant obtains all finance buyers' signatures on a retail installment contract while contemporaneously obtaining those same buyers' signatures on a form or provision purporting to relieve Defendant of its status as creditor, thereby purporting to relieve Defendant  from any obligation under TILA and from the executed RISC itself, which is contrary to the public policy expressed in TILA and is void as a matter of law.

41. A class action is superior to other available methods for the fair and  efficient adjudication of this controversy.  Since the damages suffered by, or damages available to, individual members of the class may be relatively small, although not insignificant, the expense and burden of individual litigation makes it practically impossible for members of the classes to effectively seek individual redress for the defendant's wrongful conduct alleged in this complaint.

42. Common questions of law and fact exist as to all members of each class and subclass which predominate over any question solely affecting individual members of the classes.  The questions of law and fact common to each class include the following:

a. Whether Defendant's conduct alleged in this complaint is unlawful;

b. Whether Defendant's conduct alleged in Claim One constitutes violations of TILA at 15 U.S.C. §1601(a), §1638, 12 C.F.R. §226.1(b), §226.2(13), §226.17(b), §226.18.

c. Whether Defendant's conduct alleged in Claim Two constitutes deceptive, unfair or unconscionable acts and practices in violation of the OCSPA.

d. The measure of actual, statutory, and punitive damages available to plaintiffs and to the putative classes for the defendant's wrongful conduct; and

e. Whether Defendant's alleged acts and practices should be declared as violations of TILA, the ECOA, and the OCSPA and be permanently enjoined.

43. The prosecution of separate claims by individual members of any class or subclass would create a risk of (a) inconsistent or varying adjudications which could establish incompatible standards of conduct for the Defendant; or (b) individual adjudications would as a practical matter be dispositive of the interests of other members of the class who are not parties, or would substantially impair or impede the ability of other members of the class who are not parties to the adjudication to protect their interests; and © the respective Defendant has acted or refused to act on grounds generally applicable to all members of the respective classes, thereby making declaratory and injunctive relief concerning each class as a whole appropriate.

**Prayer for Relief**

**WHEREFORE,** named Plaintiff prays for the following relief:

(a) in all claims for an adjudication that each class and subclass plead herein be determined by this Court as appropriate for class action treatment;

(b) in all claims for both statutory and actual damages to which the named Plaintiff is individually entitled;

© ) in all claims for both statutory and actual damages to which each class or subclass member is entitled;

(d) in all claims for reimbursement of reasonable attorney fees in connection for all services performed by counsel for Named Plaintiff and the class of persons he seeks to represent;

(e) in all claims for reimbursement for all costs and expenses related to the prosecution of this litigation;

(f) for a permanent injunction and/or declaratory relief in all claims as appropriate;

(g) for punitive damages in all claims where that relief may be appropriate;

(h) for a trial by jury in all claims where appropriate; and.

(I) for any and all other relief this Court may deem appropriate

Respectfully submitted by:

*/S/STEVEN C. SHANE*
Steven C. Shane (Ohio Bar #0041124)
Trial Attorney for Plaintiff
P.O. Box 73067
Bellevue, KY 41073
(859) 431-7800
(859) 431-3100 facsimile
shanelaw@fuse.net

and

***/S/EDWARD A ICOVE***

Edward A. Icove (00119646)
Icove Legal Group. Ltd.
Terminal Tower
50 Public Square
Suite 3220
Cleveland, Ohio 44113
(216) 802-0000
(216) 802-0002
ed@icovelegalgroup.com